## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

UNITED STATES OF AMERICA,

      Plaintiff,

v.                             Case No. 24-CR-30036-SPM

DEVONTA K. ACKINS,

      Defendant.

## MEMORANDUM AND ORDER

**McGLYNN, District Judge:**

Pending before the Court is a Motion to Suppress Evidence filed by Defendant Devonta K. Ackins. (Doc. 46). For the reasons set forth below, the Motion is **GRANTED**.

### FACTUAL & PROCEDURAL BACKGROUND

The parties agree on the following facts. On May 12, 2022, agents of the United States Marshal's Service ("USMS") Fugitive Task Force and other law enforcement officers arrived at 3407 Converse Avenue to execute an arrest warrant[1] for Defendant Devonta K. Ackins. (Doc. 47, p. 1; Doc. 55, p. 1). When the agents knocked at the front door, a woman later identified as Destinee Smith opened the front door. (Doc. 55, p. 2). When asked who was in the residence, Smith replied that her children were in the house with her along with her boyfriend. (*Id.*, p. 4). Upon direction from the agents, Smith and her five children exited the property. (*Id.*). Agents called into the residence

---

[1] The warrant involved parole violations associated with Ackins's felony domestic violence conviction in St. Clair County, Illinois. (Doc. 55, p. 1 n.1).

asking Ackins to surrender; he "slowly" emerged from "the direction of the living room area of the house" and was taken into custody. (*Id.*).

USMS Task Force Officer John Baudino stated in an affidavit that he was familiar with the Converse Avenue apartments and had conducted numerous arrests in them. (*Id.*, Ex. 1, p. 1). He states that, "upon opening the front door of 3407 Converse Avenue, directly to the left is an open space containing the living room," which is not visible from the front doorway where Ackins was arrested." (*Id.*). Agents entered the residence "immediately upon taking Ackins into custody in the front entryway." (*Id.*, pp. 4–5). Officer Baudino stated that "[t]he two couches in the living room created a space that was not visible from the front door. This space, along with the couches, created a space where an individual could have been concealed from law enforcement view at the time of the arrest." (*Id.*, Ex. 1, p. 2). "During the search incident to arrest, USMS observed a firearm with a drum magazine lying in plain view on the floor in the living room." (*Id.*, p. 5).

"USMS alerted SA Zach Green with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) that a firearm was observed in plain view in the living room." (*Id.*). Special Agent Green photographed the firearm and then seized it. (*Id.*). The firearm was later identified as "a stolen black Glock 22, 40 caliber semi-automatic firearm, bearing serial number SBC066, and the drum magazine was loaded with 46 rounds of ammunition." (*Id.*). Smith stated that Ackins had arrived the night prior and stayed on the couch in the living room. (*Id.*, p. 6). She stated that they had broken up but that he had been at her residence five to six times since the domestic assault incident in 2022. (*Id.*).

Green interviewed Ackins after advising him of his Miranda rights. (*Id.*, p. 6). Ackins provided his address as being 176 Skyline View Drive in Collinsville, Illinois. (*Id.*). He stated that he did not really sleep the night prior and that he spends some nights at Smith's house. (*Id.*). After a warrant was obtained for Ackins's DNA, the ATF Laboratory concluded that Ackins's DNA was a major contributor on multiple locations on the firearm in question. (*Id.*).

On March 19, 2024, a grand jury returned a one-count indictment against Ackins charging him with being a felon in possession of a firearm in violation of 28 U.S.C. § 922(g)(1). (Doc. 1). On July 14, 2025,[2] Ackins filed a Motion to Suppress Evidence obtained from a protective sweep at 3407 Converse Avenue in East Saint Louis, Illinois on May 12, 2022. (*See* Doc. 46, p. 1). Ackins argues that the protective sweep violated his Fourth Amendment rights because it was "based on a mere 'hunch of danger'" and because there were no "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warranted the officer in believing that the area swept harbored an individual posing a danger to the officer or others." (Doc. 47, p. 5 (quoting *Maryland v. Buie*, 494 U.S. 325, 334 (1990))). In opposition, the Government argues that Ackins does not have standing to contest the search and the protective sweep was reasonable and lawful under federal law. (*See* Doc. 55). Ackins filed a Reply, as well. (Doc. 57). The Court held Oral Argument on the pending Motion on August 8, 2025. (Doc. 58).

---

[2] Defendant Ackins's Motion to Suppress was filed over thirteen months late. (*See* Doc. 15 (establishing that pretrial motions must be filed no later than forty-two days after the arraignment on April 22, 2024)). This Court determined that good cause existed to permit Ackins to file a motion to suppress out of time. (*See* Docs. 45, 53).

LEGAL STANDARD

A motion to suppress seeks to exclude evidence obtained in violation of a defendant's constitutional rights. The Fourth Amendment provides "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. CONST. amend. IV. The Supreme Court has explained that "[i]n order to effectuate the Fourth Amendment's guarantee of freedom from unreasonable searches and seizures, this Court long ago conferred upon defendants in federal prosecutions the right, upon motion and proof, to have excluded from trial evidence which had been secured by means of an unlawful search and seizure." *Simmons v. United States*, 390 U.S. 377, 389 (1968).

"The Supreme Court has consistently held that 'Fourth Amendment rights are personal rights which . . . may not be vicariously asserted.'" *United States v. Carlisle*, 614 F.3d 750, 756 (7th Cir. 2010) (citing *Rakas v. Illinois*, 439 U.S. 128, 134 (1978)). In other words, "[a] person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." *Rakas*, 439 U.S. at 134, (citing *Alderman v. United States*, 394 U.S. 165, 174 (1969)).

The Supreme Court has explained that whether a defendant can challenge a search is an issue of substantive Fourth Amendment law. *See Carlisle*, 614 F.3d at 756 (citing *Rakas*, 439 U.S. at 143). That substantive law "protects against warrantless intrusions by the government into areas in which that individual holds a reasonable expectation of privacy." *United States v. Villegas*, 495 F.3d 761, 767 (7th Cir. 2007) (citing *Unites States v. Yang*, 478 F.3d 832, 835 (7th Cir. 2007)).

The Fourth Amendment generally prohibits the warrantless entry of a person's home or hotel room to search for specific objects. *See Illinois v. Rodriguez,* 497 U.S. 177, 181 (1990). This prohibition does not apply to situations in which voluntary consent has been obtained from the individual whose property is to be searched. *Id.* Put another way, warrantless searches are permissible if the police received voluntary consent to search. *See United States v. Hicks,* 650 F.3d 1058, 1064 (7th Cir. 2011).

However, the United States Supreme Court has determined that in certain circumstances, police officers can lawfully conduct a warrantless search. In *Terry v. Ohio,* the Court ruled that "police conduct, necessarily swift action predicated upon the on-the-spot observations of the officer on the beat . . . as a practical matter could not be, subjected to the warrant procedure." *Terry v. Ohio,* 392 U.S. 1, 20 (1968). The Court has recognized that as a precautionary matter and without probable cause or reasonable suspicion, police officers can conduct "protective sweeps" by looking in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched. However, this sweep must be based on "specific and articulable facts" that lead officers to believe there are individuals on the premises that pose a danger. *Maryland v. Buie,* 494 U.S. 325, 327 (1989) (quoting *Michigan v. Long*, 463 U.S. 1032, 1049–1050 (1983)).

That being said, "when the government obtains evidence in violation of an individual's Fourth Amendment rights, the remedy is generally the exclusion of that evidence—and evidence that is the fruit of the illegal search or seizure—at trial." *United States v. McGill*, 8 F.4th 617, 624 (7th Cir. 2021) (citing *Utah v. Strieff*, 579

U.S. 232, 237–39 (2016)). "But this rule does not apply automatically. Rather, it applies 'only . . . where its deterrence benefits outweigh its substantial social costs,' and certain exceptions to the rule have arisen accordingly." *Id.* (citing *Strieff* at 237–39). One of these exceptions is the "good faith" exception, which applies when officers "act with an objectively reasonable good-faith belief that their conduct is lawful." *United States v. Rainone*, 816 F.3d 490, 495 (7th Cir. 2016) (citation modified).

ANALYSIS

## I.    Standing

In his Motion to Suppress and in his Reply, Ackins argues that he has standing to contest the search of Ms. Smith's home as an overnight guest. (Doc. 47, pp. 2–4; Doc. 57). He points to Smith's interview, where she stated that Ackins came to the duplex the night before (Doc. 55, p. 2) as well as the fact that he had stayed overnight at her residence five to six times since March 2022 (Doc. 57, p. 3). The Government argues that Ackins failed to demonstrate standing. (Doc. 55, p. 6). They argue that Destinee Smith stated in her interview that Ackins did not live at her residence as they were "broken up," but that, sometimes, he would come over late. (*Id.*, p. 7). Smith stated that she has to unlock the door for Ackins because he does not have a key and that, therefore, he does not have access to her residence when she is not present. (*Id.*). The Government also points to Ackins' statement to law enforcement that "he did not sleep the night prior" and that he was arrested in the morning; they also argue that the fact that Ackins did not keep belongings at Smith's house indicates that he was not an overnight guest in line with established caselaw. (*Id.*). Ackins disputes this, arguing at Oral Argument that a hotel guest need not bring their belongings into a

hotel room to be classified as an overnight guest. (Doc. 58).

In *Minnesota v. Olson*, the Supreme Court found that overnight guests have a legitimate expectation of privacy in their host's homes. 495 U.S. 91 (1990). In doing so, the Court flatly rejected a multifactor reasonability test proposed by the State of Minnesota and found that because Olson was an "overnight guest" at the invaded dwelling, this was enough to show that he had a legitimate expectation of privacy "that society was prepared to recognize as reasonable." *Id.* at 97. In effect, the Court observed that staying overnight as a guest in another's home "is a longstanding social custom that serves functions recognized as valuable by society." *Id.* at 98. An overnight guest, in turn, would naturally "seek shelter in another's home precisely because it provides him with privacy . . . not [to] be disturbed by anyone but his host and those his host allows inside." *Id.* at 99. Further, the Court reasoned that society would consider an expectation of privacy reasonable because of one's vulnerability when asleep – which is why we seek out our own home or another private place for shelter (such as a host's home or hotel), rather than a public place, where we cannot monitor our own safety or secure our belongings. *Id.* Additionally, the Court found that the overnight guest generally has some measure of control over the premises (i.e., the host will not usually confine a guest to one particular area of the house), and that the host will usually not admit someone into his home who wants to see or meet with the guest over the guest's objection. *Id.* In other words, the Court believed that hosts will more likely than not respect the privacy interests of their overnight guests. *Id.* at 100. Thus, reasonableness and even subjective expectation of privacy appear to be absolute when it comes to overnight guests with permission to stay.

In this case, Ackins was clearly an overnight guest at the Converse Avenue house. The night before the search, he stayed there; what time he arrived and whether he actually slept or not is immaterial. Moreover, the Government's argument that he was not an overnight guest because he did not have keys to Smith's residence and did not leave belongings there does not hold water. As Ackins argues in his Reply, the Supreme Court in *Olson* did not consider whether or not the defendant had keys to the residence as being relevant to whether or not they were an overnight guest. (Doc. 57, pp. 3–4 (citing *Olson*)). Therefore, this Court holds that Ackins has standing to challenge the warrantless search of Smith's residence.

## II.    The Search

Ackins argues that the officers' protective sweep violated the Fourth Amendment as described in *Buie* because the firearm was not "immediately adjoining the place of arrest" and because the officers did not allege that they heard or saw anyone else at the residence in question. (Doc. 47, p. 5; *see id.*, pp. 5–7). Ackins also alleges that:

> There was no indication individuals in the home were involved in criminal activity or taking measures to evade police, there was no report of an armed occupant in the home, there was no evidence Mr. Ackins was involved in a drug operation or other criminal activity jointly with other criminals, nor was there any suggestion that dangerous criminal activity was taking place in the home.

(*Id.*, p. 7).

The Government argues that the search at issue fits within the exceptions to the warrant requirement. First, they argue that "[t]he living room, where the firearm was recovered in plain view, was a space 'attached to', 'lying next to', and 'in contact

with' the space Ackins was arrested in." (Doc. 55, p. 8 (citing *id.*, Ex. 1)). They argue

that Ackins "was arrested walking from the living room at the front door of the home,"

which immediately adjoins the front entryway and "was immediately searched upon

Ackins' arrest." (*Id.*, pp. 8–9). The Government argues that Smith initially said it was

only her and her kids in the home, only later admitting that Ackins was there while

looking toward the living room. (*Id.*, p. 9). They argue there was a risk of attack

because a sliding glass door "directly accessed the outside of the residence where law

enforcement was present." (*Id.*).

The Government next argues that the search was a protective sweep because

"Ackins had extensive history of convictions for violence, and was the suspected target

of homicide outside the same residence." (*Id.*, p. 11). They insist that "[a] reasonable

inference based upon this history, Smith's misleading and vague statements, and

Ackins failure to promptly respond to USMS, was that Ackins and/or others inside

posed a danger to law enforcement" and that "the obstructed sliding glass door on the

ground floor was tactically concerning." (*Id.*). The Government argues that "this

protective sweep was not 'automatic'" because "USMS had sufficient articulable facts

to justify the sweep based upon concerns that an individual posing a danger was

located inside." (*Id.*). They continue, asserting that "USMS' protective sweep of the

residence immediately following Ackins' arrest was brief and did not extend beyond

spaces where an individual who posed a danger could be located" and that "[t]he

firearm was located in the living room, on the floor, between the two couches." (*Id.*).

Finally, the Government argues that the good faith exception to the

exclusionary rule applies here, insisting that "[b]ased on the combination of facts

described above, and all of the evidence in the instant case, it is clear that the search incident to arrest and protective sweep were conducted by officers acting in good faith." (*Id.*, p. 13).

The Supreme Court articulated in *Maryland v. Buie* that police officers could "assure themselves" that the premises of the arrest was not harboring other dangerous individuals by conducting a protective search. Additionally, "officers should not be forced to suffer preventable risk of ambush, even where a location is so isolated that the officers could conceivably be protected without entering the area." *United States v. Burrows,* 48 F.3d 1011, 1013 (7th Cir. 1995).

Moreover, various cases from the Seventh Circuit have given police officers considerable autonomy in conducting protective sweeps when they are made aware of the presence of others on the premises. In *United States. v. Contreras*, the Seventh Circuit upheld the District Court's determination that the presence of another person justified the search. 820 F.3d 255, 269 (7th Cir. 2016) ("Having heard the presence of another person, the police were entitled to sweep the house for their own protection."). In *United States v. Henderson*, police officers, after detaining an individual, "did not know how many occupants or what the occupants were doing inside the house"; as a result, the Court found that their search was considered lawful. 748 F.3d at 792. That being said, the Seventh Circuit also recognized that "the sweep is a device that can easily be perverted to achieve ends other than those acknowledged as legitimate in *Buie*." *Henderson*, 748 F.3d at 791 (citing *Burrows*, 48 F.3d at 1017).

However, in a recent opinion, the Seventh Circuit reversed this Court's denial of a Motion to Suppress under a fact pattern similar to the instant case. *See United*

*States v. Walker*, 704 F. Supp. 3d 866 (S.D. Ill. 2023), *rev'd and remanded*, No. 24-1522, 2025 WL 1982305 (7th Cir. July 17, 2025). On October 28, 2022, law enforcement officers of the United States Marshals Great Lakes Regional Fugitive Task Force arrived at a trailer home located at 313 Short Street in Brooklyn, Illinois and owned by Walker's girlfriend. *Id.* at 869. Walker's minor son answered the door and informed officers that he was not sure if any others were inside. *Id.* After Walker emerged and was taken into custody, law enforcement officers performed a purported protective sweep within the residence. *Id.* The officers lifted up a mattress in the minor son's bedroom and discovered a firearm. *Id.* Walker's girlfriend and her daughter arrived after the search and signed a consent form permitting officers to conduct a more detailed search. *Id.* (citing Docs. 25; 29; 29, Ex. 1). Officers subsequently located "pill capsules filled with powder (later determined to be fentanyl), a bag of empty capsules, a pill press, a pipe, scales, and Walker's credit card in a pile of men's clothing in Paulette's bedroom." *Id.* (citing Docs. 25 Ex. 1; 29). In a report of the investigation, officers stated that "individuals have been known to hide underneath mattresses, beds, tables, behind doors, inside closets, dryers, etc. to evade being arrested." *Id.* (Doc. 25, Ex. 1).

In his motion to suppress, "Walker argued that there were no exigent circumstances to justify the search underneath the mattress in Walker's son's bedroom." *Id.* at 871. "The Government argued that the search was within the proper scope of a protective sweep." *Id.* This Court denied the motion to suppress, finding that the protective sweep was constitutional because "the officers had information that there were others that could be on the premises in a confined trailer home" and

because the law enforcement officers "stated that they believed that a person could hide underneath a mattress at the time of the search and it appears from the photographs in the record that, although awkward positioning would exist, an attack could be launched from between the mattress and the box spring." *Id.* at 872.

Walker also argued that his girlfriend's "consent was tainted by an initial, illegal entry." *Id.* This Court held that the seizure of the firearm fell within "the attenuated exception to exclusion" because the consent was temporally proximate, because Walker's girlfriend was not present during the protective sweep, and because "officers had a valid arrest warrant and conducted a protective sweep incident to an undisputedly lawful arrest." *Id.* at 873.

The Seventh Circuit disagreed, holding that "the district court erred by concluding that officers may initiate a protective sweep following an arrest merely based on the possibility that other persons could be present. More is required." 2025 WL 1982305, at *4. They stated that "[a] protective sweep requires officers to have reason to believe the premises harbor not just a person, but a person who poses a danger to those on the scene." *Id.* (citing *Buie*, 494 U.S. at 334; *United States v. Burrows*, 48 F.3d 1011, 1017 (7th Cir. 1995); *United States v. Barker*, 27 F.3d 1287, 1289–92 (7th Cir. 1994)). They continued, stating that "a protective sweep must not be based on 'a mere inchoate and unparticularized suspicion or hunch of danger.'" *Id.* (citing *United States v. Tapia*, 610 F.3d 505, 510 (7th Cir. 2010)) (citation modified). Moreover, the Seventh Circuit held that, "even assuming the protective sweep was justified, it became unlawful in scope when officers lifted the mattress in Walker Jr.'s bedroom" because "[a]lthough it may have theoretically been possible for a person to

have hollowed the inside of the mattress or box spring to create a hiding place from which to attack, theoretical possibilities cannot be enough." *Id.* at *5. "Finding otherwise would permit officers to lift a mattress in every protective sweep, regardless of the reasonableness of their suspicions or configuration of the premises." *Id.*

The Seventh Circuit also found that none of the Government's argued exceptions (good faith, attenuation, and inevitable discovery) to the exclusionary rule applied. *See id.* at *6–8. They determined that the Government failed to prove the officers in question acted in good faith when lifting the mattress in Walker's son's bedroom, *id.* at *6; that "the attenuation exception cannot apply where the evidence was discovered and seized during an initial unlawful search and before a consensual search," *id.* at *7 (citing *Davis*, 44 F.4th at 690–91); and that "[t]he district court did not decide whether the inevitable discovery exception applied, despite the exception being raised by the parties," *id.* at *8. The case was reversed and remanded to this Court for reevaluation of Walker's motion to suppress. *Id.* at *9.

Turning to the instant case, the facts here resemble those at issue in *Walker*. Ackins was staying at his ex-girlfriend's duplex home, came to the front door of the duplex, and was arrested just within the threshold. Law enforcement then entered the residence via the living room and found the firearm between the two couches. (Doc. 55, pp. 4–5). At Oral Argument, Task Force Officer John Baudino argued that the arresting officers needed to step into the living room to check a "blind spot" between the two couches because an attack could be launched from there. Ackins argued that only a "tiny" person could possibly hide between the two couches and that

officers could have seen anyone crouching in the corner in question. Baudino stated that the search of the living room was "immediate" and "instantaneous" and that only two or three steps into the living room revealed the firearm on the floor between the couches in question. Baudino insisted that officers were only in the living room for two seconds. The Government argued that the search at issue was a search incident to arrest (not a protective sweep), and, thus, is distinguishable from the protective sweep in *Walker*.

First, this Court holds that the Government's argument that the search was lawfully conducted incident to arrest is unavailing. Recall that:

> As an incident to a lawful arrest, the police can search not only the person they have arrested to make sure he doesn't have a weapon but also and for the same purpose *they can search the area within his immediate control—the area within grabbing distance—in which a weapon might be concealed* that he could attempt to use against the officers or in which there might be evidence of his crime that he could destroy.

*United States v. Tejada*, 524 F.3d 809, 811 (7th Cir. 2008) (emphasis added) (citing *Chimel v. California*, 395 U.S. 752, 763 (1969); *United States v. Thomas*, 512 F.3d 383, 387 (7th Cir. 2008))). In *United States v. Tejada*, the Seventh Circuit held that officers were entitled to open an entertainment center "within a few steps" of the defendant. *Id.* at 811. They noted that the defendant lived in a tiny apartment, resisted arrest, reached for a gun on his person, and "seemed desperate," even though "he was unlikely to be able to make a successful lunge for the entertainment center" when "surrounded by police." *Id.* at 811–12.

In both *Walker* and in *Ackins*, the respective defendants did *not* physically resist arrest. Like in *Walker*, Ackins came to the front of the duplex and was

immediately detained. The Government argues that Ackins did not initially come to the door, meaning that they were unsure of his intentions. The Government also insists that the officers saw the firearm in question after only taking two or three steps into the living room to look behind the couch, which seems like the situation in *Tejada*. Unlike in *Tejada*, however, Ackins did not have a weapon on his person, did not reach for a weapon, and the Government does not provide any evidence or testimony indicating that Ackins was "desperate" and likely to lunge for a weapon.

Considering the above, this Court holds that the officers' taking two or three steps into the living room to look between the couches took this search beyond Ackins' immediate control. Ackins could not have reached the weapon or hidden it from officers when he was arrested at the entryway of the residence and there is no evidence that he was either "desperate" or armed at the time of his arrest. *See Tejada*, 524 F.3d at 811–12. Therefore, the *instant* officers took additional steps into Ms. Smith's living room, the search progressed beyond the area of Ackins' immediate control. The Government cannot make use of this exception.

Second, this Court holds that this search was not a valid protective sweep. Although the Government insisted at Oral Argument that this search was a lawful search incident to arrest, they did argue in their brief that it was a valid protective sweep. (*See* Doc. 55, p. 11). This Court disagrees because law enforcement offered nothing more than vague statements about concern for their safety and Smith's initial denial that anyone else was in the home; this is a far cry from the required "specific and articulable facts." *See Maryland v. Buie,* 494 U.S. 325, 327 (1989) (quoting *Michigan v. Long*, 463 U.S. 1032, 1049–1050 (1983)). The Government's

insistence that Ackins was convicted for domestic violence and, therefore, could have responded violently is vague and conclusory, especially since he was detained at the threshold of the duplex. Moreover, their argument that Ackins and Smith were witnesses to a homicide at the same property the month before borders on fanciful. The Court finds it hard to believe that the USMS Task Force was concerned that those who wanted to kill Smith and Ackins *thirty days before* were hiding within *Smith's own residence*. The officers' justification here seems much more like "a mere inchoate and unparticularized suspicion or hunch of danger." *Walker*, 2025 WL 1982305, at *4 (citing *United States v. Tapia*, 610 F.3d 505, 510 (7th Cir. 2010)) (citation modified).

Therefore, all that can save this search is the good faith exception to the warrant requirement. *See United States v. Rainone*, 816 F.3d 490, 495 (7th Cir. 2016). Unlike the firearm hidden under a mattress in Walker Jr.'s bedroom, the firearm in question was in plain view. However, more concerning to this Court is the fact that the United States Marshals Great Lakes Regional Fugitive Task Force conducted both the search here and the search at issue in *Walker*. (*See* Doc. 55, Ex. 1). For this and other reasons, this Court agreed with Ackins that an evidentiary hearing was required (Doc. 57, p. 4). While Baudino insisted that an attack could be launched from between the couches, this Court is skeptical that an adult could successfully conceal himself or herself in the "blind spot" between the two couches. Moreover, the Government has offered no testimony that officers had any indication that any other illegal activity was occurring at the residence; the warrant in question was for parole violations in a domestic violence case. Either way, this Court sees no reason why

officers could not have either (1) asked Ms. Smith for her voluntary consent to search her apartment after Ackins' arrest or (2) obtained a valid search warrant for the premises. Therefore, this Court holds that officers did not conduct the search in question in good faith.

Considering the Seventh Circuit's most updated analysis, this Court finds that the Government has failed to carry its burden to prove that the search at issue meets the good faith exception to the exclusionary rule. It is clear that the USMS Task Force needs to be sent a message and that "[t]he benefits of deterrence . . . outweigh the costs" in the instant case. *McGill*, 8 F.4th at 624 (citing *Herring v. United States*, 555 U.S. 135, 141 (2009)). Ackins's Motion to Suppress shall be granted.

### CONCLUSION

For the foregoing reasons, Defendant Devonta K. Ackins's Motion to Suppress Evidence (Doc. 46) is **GRANTED**.

**IT IS SO ORDERED.**

**DATED:   September 19, 2025**

<u>**s/ *Stephen P. McGlynn***</u>
**STEPHEN P. McGLYNN**
**U.S. District Judge**